**Michael NEARY and St. Johns Holdings, Inc., Appellants,**

v.

**MIKOB PROPERTIES, INC., Comunidad Corporation, Allan Klein, Mitchell Kobernick, Individually and as General Partner of Mikob Ltd., Comunidad Balboa, LLC, Comunidad Capital LLC, Comunidad Harbortree**

---

LLC, Comunidad Stonehaven LLC, Comunidad Wisteria Gardens LLC, Comunidad Kensington Club II, LLC, Balboa Partners, Ltd., BP Apt. Management, L.C., KCP Management, L.C., O. Creek Management, Inc., Oaks of Brittany Management, Inc., Oaks of Brittany, Ltd., S. Haven Management, L.C., S. Haven Partners, Ltd., F. Court Management, L.C., F. Court Partners, Ltd., Harbortree Apartments, Ltd., Amherst Partners Ltd., AEP Management, L.C., Ashford Est. Partners, Ltd., Kensington Green (Mk), Inc., Kensington Green (Ak), Inc., Kensington Club Partners, Ltd., and Preston Affiliates, Inc., Appellees.

No. 05–09–01175–CV.

Court of Appeals of Texas, Dallas.

May 9, 2011.

Thomas V. Murto III, Mitchell Madden, The Law Offices of Mitchell Madden, Mel-

issa A. Johnson, MaddenSewell, LLP, Dallas, TX, for Appellants.

Michael W. Eaton, Eaton Law Firm, PLLC, Southlake, TX, Jeffrey Scott Lowenstein, Bell Nunnally & Martin, LLP, Dallas, TX, Mark Alan Sanders, Law Office of Mark A. Sanders, Houston, TX, for Appellees.

Before Justices MURPHY, FILLMORE, and MYERS.

## OPINION

Opinion By Justice FILLMORE.

In this suit to obtain a real estate brokerage commission, the trial court granted summary judgment in favor of appellees based on the statute of frauds provision of the Real Estate Licensing Act (RELA). *See* TEX. OCC.CODE ANN. § 1101.806(c) (West 2004). In a single issue, appellants assert the trial court erred in granting appellees' motion for summary judgment. We affirm the trial court's judgment.

## BACKGROUND

Appellants Michael Neary and St. John's Holdings, Inc. (SJH),[1] brought suit to recover a brokerage fee in connection with the sale of eight apartment complexes to appellee Comunidad Corporation in December, 2003. The final purchase agreement did not include a provision awarding a real estate broker's fee. Neary is a

licensed real estate broker, and held a valid license at all relevant times. SJH is a Texas corporation wholly owned by Neary, to which Neary had assigned his commissions. SJH did not hold a real estate broker's license at the time of the Comunidad transaction.

The appellees[2] are individuals and entities connected with the 2003 transaction. As described by appellees, the buyer Comunidad Corporation is "a section 501(c)(3) non-profit tax exempt entity and is also tax exempt under the Texas Tax Code." In their summary judgment evidence, appellees describe Comunidad Balboa, LLC, Comunidad Kensington Club II, LLC, Comunidad Harbortree, LLC, Comunidad Capital, LLC, Comunidad Stonehaven, LLC, and Comunidad Wisteria Gardens, LLC (collectively the "Comunidad entities") as "Texas limited liability companies that were created to take ownership and title to the subject apartments as part of the sale to Comunidad Corp. that closed on December 29, 2003." The Comunidad entities "are wholly owned by Comunidad Corp., in that Comunidad Corp. was and continues to be the sole member of these LLC's," according to the summary judgment affidavit of appellee Mitchell Kobernick. Kobernick is the President of appellee Mikob Properties, Inc., a Texas corporation.

Certain limited partnerships owned by Kobernick and appellee Allan Klein were

1. Another plaintiff, 20/20 Management Company, Inc., is not a party to this appeal.

2. Appellants' brief lists three entities as "Appellees/Defendants" who did not join in the motion for summary judgment and are not included in the trial court's order of severance of August 25, 2009, which allowed the summary judgment to become a final judgment. One of these entities, Comunidad Kensington Club LLC, was not included as a defendant in the operative Fourth Amended Petition and apparently is not a party to the

lawsuit. The other two entities, Comunidad Kensington Club I, LLC, and Kensington Club Apartments, Ltd., were named as defendants in the fourth amended petition, but footnote 2 of the motion for summary judgment recites that these defendants were "in bankruptcy" and were "severed from this case by court order signed April 6, 2009," and the trial court record reflects the severance. For these reasons, these entities are not parties to this appeal and we do not include them in the caption of this opinion or in our judgment.

the sellers in the transaction; these seller entities are identified by the parties as appellees Balboa Partners, Ltd., BP Apt. Management, L.C., KCP Management, L.C., Oaks of Brittany Management, Inc., Oaks of Brittany, Ltd., S. Haven Management, L.C., S. Haven Partners, Ltd., F. Court Management, L.C., F. Court Partners, Ltd., Harbortree Apartments, Ltd., Amherst Partners Ltd., AEP Management, L.C., Ashford Est. Partners, Ltd., Kensington Green (Mk), Inc., Kensington Green (Ak), Inc., and Kensington Club Partners, Ltd. (collectively the "Seller entities"). Appellee O. Creek Management, Inc.,[3] was "acting as trustee" for the Seller entities, according to appellees' brief. Appellee Preston Affiliates, Inc. was awarded the asset management contract for the apartments.

Appellants claim a document dated November 17, 2003, entitled "Term Sheet," combined with several e-mail messages exchanged before and after the date of the Term Sheet, constitute a contract for a brokerage fee of one percent of the purchase price, and allege appellees breached the contract by failing to pay. Appellees asserted in their motion for summary judgment that the Term Sheet and other documents did not satisfy the requirements of section 1101.806(c) of RELA. Appellees also asserted that SJH was not licensed as a broker until November 1, 2007, and therefore could not file suit to recover a commission from the Comunidad transaction.

The Term Sheet is signed by Neary on behalf of Comunidad Corporation and by Kobernick on behalf of Mikob Properties, Inc.; however, in handwriting above the signature lines appears the sentence, "This term sheet is a guideline only, and is not binding." The Term Sheet identifies the "Purchaser" as "A Texas limited liability company to be formed with 100% of the membership interest being owned by Comunidad Corporation, a Texas non-profit corporation (IRS 501 C–3)." Although the term "Seller" is used in the Term Sheet, no seller is identified. The "Property" is defined as "Those particular Apartment Communities commonly known as Harbortree, Balboa, Capital Estates, Wisteria Gardens, Oaks of Brittany, Kensington Club I & II, Stonehaven at the Galleria, and Fondren Court. A separate LLC shall be formed for the purchase of each property." The Term Sheet also includes a paragraph entitled "Brokerage Fee" which provides:

St. Johns Holdings and Legacy Commercial Group and International Realty Concepts which will receive a commission (the "Commission") equal to a total of 2.0% of the Purchase Price. One half of said commission will be paid to St. Johns and one quarter each to Legacy and International. These funds will be paid by Seller, after Seller has recovered its out of pocket expenses funded at closing, plus the loan assumption fee that Seller is obligated to pay. The commission amount shall bear the same rate of interest paid Seller, interest only, until Seller has recouped all of its "out of pocket expenses." When Seller has recouped its expenses, Seller shall pay the Brokers the fee, amortized over 54 months, payable at the interest rate paid (not accrued) on the Vendor Debt, provided however, that in no event, will the brokerage fee paid in any given month be more than 30% of the Vendor lien payment actually received by Vendor. To the extent that payment is not available, the fee will accrue. Notwithstanding the foregoing, the Commission payments shall cease and no further

---

3. O. Creek Management, Inc. was formerly known as "Oak Creek Management, Inc."

payments shall be owed in the event that the ad valorem tax abatement shall cease to be in effect, or in the event that Seller forecloses on the property due to the failure of Communidad to maintain its non profit status, thereby forfeiting the tax abatement.

In addition to the Term Sheet, appellants rely on e-mail messages to satisfy the requirements of RELA. The e-mails were exchanged prior to and after the date of the Term Sheet. The first e-mail is dated Sunday, November 9, 2003, from Mike Neary to Mitch Kobernick. The subject line of the message reads, "Communidad." [4] The text of the message is as follows:

John Martin and I have reviewed your counter proposal. We are going to try and reach you on most of your points. However, we truly need 1% commission to our side, and are indifferent as to what you propose to pay Joachim and Hendricks. If you choose to cut their commission, we will not be alarmed. Clearly we are doing all of the work, and feel that we can get Mr. Martin, close to your price and terms, if we are properly incentivized.

I will call you in the morning, to try and resolve all issues. I cancelled my out of town weekend to work on your deal, and hope to reach final resolution by noon tomorrow. I look forward to talking to you at your convenience.

Additional e-mails on which appellants rely are in a series dated November 13 and 14, 2003, between Neary and Kobernick. Kobernick first writes to Neary that he has "incorporated the full 2% commission" in the term sheet. Neary responds, "Mitch, we are not going to take a subordinate position to the other brokers. The payments will be 50% to St. Johns Holdings,

Inc. and 25% to Joachim and 25% to Legacy." Neary also addresses other issues including the asset management fee and the interest rate. Kobernick then responds, "The broker commission will need to be worked out between the brokers. I can split the 30% any way you all agree." Kobernick's response includes a discussion of the interest rate and other unresolved matters. The last message in the series is Neary's response to Kobernick. Neary states that "I told Jerry and David about the fee, and they are fine with it." He addresses several other issues, and concludes, "I can get this done for you, but on the terms I sent. Let me know if you want to proceed." The Term Sheet is dated three days later.

Appellants also cite to e-mails dated March 9 and 10, 2004, from Kobernick to Neary. In the March 9 series of messages between Neary and Kobernick, Neary first complains about lack of communication from Kobernick and asks for a date "to resolve all issues or forget the dialogue all together." Kobernick responds regarding the status of a draft agreement relating to payment of a broker's commission, stating in part:

The current draft has been greatly modified to deal with both your, and the other brokers' issues. We have given in on a lot of the things you wanted, so I think we have shown a great deal of good faith. I don't appreciate your threats. We have spent more time on the broker documents than on the deal itself, and we are still hammering it out. Our intention is to make the deal work out for all concerned. If you don't believe that, you are always free to pursue whatever course of action you feel you need to follow to protect your interests.

Neary responds by suggesting that the brokers be paid in cash rather than a note,

---

4. The spelling of "Comunidad" varies throughout the documents in the record.

and questions why all of the brokers must agree to a single document relating to payment of a broker's commission. Kobernick responds:

I originally thought that if there was a holdout, we could sign with those willing to sign. I have since changed my position and would prefer that all brokers sign, and that all brokers get paid. To do that, we are taking all comments and putting them into one document. I don't want to just sign with the willing and ignore those left behind. I want everyone to get paid, and to that end we have spent an enormous amount of time and energy to get a document that all could live with. That is still our goal.

The following day, Neary requests "to see all the documents relating to the sales transaction with Comunidad." Kobernick and Neary then debate the propriety of keeping these documents confidential. After several exchanges, Kobernick replies:

I don't believe that the terms of the deal between the buyer and the seller affect your note payments. Your note says that you get paid when the seller gets paid. Whether or not the seller note gets paid is wholly dependant [sic] on the cash flow of the properties. Perhaps you would be better served to do a full appraisal of the properties and a market analysis if you want to determine the value of your note. The deal between buyer and seller is between the buyer and seller. With all due respect, the brokers are not party to that.

This lawsuit was filed after the parties failed to agree on the terms for payment of a commission to Neary or SJH. The trial court granted appellees' motion for summary judgment, and by order dated August 25, 2009, severed the parties and causes of action included in the summary judgment "so that the summary judgment order dismissing such claims and causes of

action may become a final judgment." This appeal followed.

## STANDARD OF REVIEW

The standard of review for both a traditional and a no-evidence summary judgment is well known. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); *Gen. Mills Rests., Inc. v. Texas Wings, Inc.,* 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.). With respect to their traditional motion for summary judgment, appellees had the burden to demonstrate that no genuine issues of material fact existed and they were entitled to judgment as a matter of law. *See Nixon,* 690 S.W.2d at 548–49. To defeat the no-evidence summary judgment, however, appellants were required to present sufficient evidence to raise a genuine issue of fact on each challenged element of their claims. *See Gen. Mills,* 12 S.W.3d at 832–33. We review the grant of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). In reviewing a grant of summary judgment, we take as true evidence favorable to the nonmovant, making every reasonable inference and resolving all doubts in the nonmovant's favor. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). Because the trial court granted appellees' motion for summary judgment without specifying the grounds on which it was based, appellants must establish that each summary judgment ground alleged by appellees was insufficient. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995).

## ANALYSIS

■ Section 1101.806(c) of the Occupations Code provides:

A person may not maintain an action in this state to recover a commission for the sale or purchase of real estate unless

the promise or agreement on which the action is based, or a memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign the document.

Appellants concede this provision applies to their claim for a commission, but contend that the statutory requirements have been met by reading together the Term Sheet and the e-mail messages. We considered section 1101.806(c) most recently in *Lathem v. Kruse,* 290 S.W.3d 922 (Tex. App.-Dallas 2009, no pet.). In *Lathem,* we explained that "strict compliance with RELA is required; the agreement to pay a real estate commission must be in writing or it is not enforceable." *Id.* at 925 (citing *Brice v. Eastin,* 691 S.W.2d 54, 57 (Tex.App.-San Antonio 1985, no writ)). To comply with RELA, an agreement or memorandum must:

> (1) be in writing and must be signed by the person to be charged with the commission; (2) promise that a definite commission will be paid, or must refer to a written commission schedule; (3) state the name of the broker to whom the commission is to be paid; and (4) either itself or by reference to some other existing writing, identify with reasonable certainty the land to be conveyed.

*Id.* (citing *Knight v. Hicks,* 505 S.W.2d 638, 642 (Tex.Civ.App.-Amarillo 1974, writ ref'd n.r.e.)).

■ As defendants moving for summary judgment based on section 1101.806(c), appellees were required to prove that (1) appellants' suit is for the recovery of a commission for the sale or purchase of real estate, and (2) the appellees signed no written promise, agreement, or memorandum to pay a commission. *Id.* at 926. The first element is not in dispute. With respect to the second element, appellees contend the Term Sheet and the other communications relied upon by appellants do not constitute a written promise, agreement, or memorandum to pay a commission. We agree.

Appellees concede that the Term Sheet does not satisfy RELA. Initially, we note that the Term Sheet included a statement that it was "a guideline only, and is not binding." Appellees cite to *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12 (Tex.App.-Houston [1st Dist.] 2000, pet. denied), in which a letter agreement included a paragraph entitled "binding effect." The paragraph concluded with the statement, "Accordingly, it is understood and agreed that this letter is an expression of the parties' mutual intent and is not binding upon them," with the exception of certain specific paragraphs. *Id.* at 15. The *John Wood Group* court concluded the agreement lacked mutual consent because of the "non-binding" clause. *Id.* at 20. The court explained,

> [T]he Wood Group, by including the "non-binding" clause in paragraph 15, withheld its consent to be bound on those agreed-upon terms until a final purchase agreement was signed.... In interpreting a contract, if it can be given a definite or certain meaning, the contract is not ambiguous as a matter of law. [Citation omitted.] We believe that the term "not binding," as it is used in this letter agreement can be given a definite or certain meaning. "Not binding" in this case means exactly that, not binding. Although the parties reached a tentative agreement on the essential terms of the contract, the letter agreement specifically stated that those terms would not be binding.

*Id.* at 20. As in *John Wood Group,* the parties here reached a tentative agreement on a commission to be paid to SJH under the terms specified, but the Term Sheet

specifically stated that those terms were "a guideline only" and "not binding."

The Term Sheet has additional deficiencies. *See Lathem*, 290 S.W.3d at 925. As to the first *Lathem* requirement, signature by the party to be charged, the Term Sheet provides that the "Seller" will pay the commission. The Term Sheet, however, never identifies the "Seller." The Term Sheet is signed by Neary on behalf of Comunidad Corporation, an entity connected with the "Purchaser," and by Kobernick on behalf of Mikob Properties, Inc. The Term Sheet does not reveal the relationship between the Seller and Kobernick or Mikob. While there was testimony that Kobernick had authority to sign the Term Sheet on behalf of the Seller entities, none of the writings relied on by Neary to comprise the memorandum satisfying the statute of frauds contained this information. In *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex.1978), the court explained that the written memorandum required by the statute of frauds must contain "all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." The memorandum must be "complete within itself in every material detail." *Id.* Where the documents did not identify the alleged assignor, they were insufficient to comply with the statute of frauds. *Id.* The oral testimony regarding Kobernick's authority may not be considered in determining whether the memorandum was signed by the party to be charged. *See id.*

As to the second and third *Lathem* requirements, a definite commission and the name of the broker to be paid, the Term Sheet provides that SJH and two others will receive a commission "equal to a total of 2.0% of the Purchase Price," and includes terms for payment. Neary, however, is not identified as a "broker to whom the commission is to be paid." *See La-*

*them*, 290 S.W.3d at 925. In their motion for summary judgment, appellees further asserted that SJH, the only plaintiff identified in the Term Sheet, could not recover a commission from the sale to Comunidad because it was not a licensed broker until several years after the transaction. Appellants counter that Neary was licensed at all relevant times, and SJH was Neary's "agent for receipt of his commissions."

The Texas Supreme Court rejected a similar argument in *Henry S. Miller Co. v. Treo Enterprises*, 585 S.W.2d 674, 678 (Tex.1979). In that case, Henry S. Miller Co. (referred to as "Miller" in the opinion) obtained the exclusive right to sell a warehouse in Dallas County and was named as principal agent in a contract of sale. *Id.* at 675. In a subsequent transaction, Miller obtained a promissory note from Treo Enterprises in the amount of its commission. *Id.* When Treo stopped making payments on the note, Miller sued. *Id.* Miller, however, did not plead or prove that it was a licensed broker. *Id.* The jury found the note was made for the purpose of paying a real estate commission to Miller, and both the court of appeals and the supreme court agreed. *Id.* at 675, 677. Because the suit was "an action to recover a fee in exchange for brokerage services," *id.* at 677, RELA was applicable, and "Miller was required to plead and prove that it was a duly licensed real estate broker in order to recover on the note representing its commission." *Id.* at 677–78. Miller argued it had complied with RELA because its employee, the person actually performing the brokerage services, was a licensed broker. *Id.* at 678. The court disagreed:

> This argument was foreclosed by our recent opinion in *Coastal Plains Development Corp. v. Micrea, Inc.*, 572 S.W.2d 285 (Tex.1978). In that case Micrea contended that it had complied with the Act since its president, who performed the brokerage services, was duly

licensed at all relevant times. Without expressing an opinion as to whether this fact constituted substantial compliance, we held that substantial compliance would not suffice.

*Treo Enters.*, 585 S.W.2d at 678. The court concluded that strict compliance with RELA was required. *Id.* Because Miller's name appeared as principal agent in the contract of sale, and Miller sought to recover the commission in its own name, Miller could not comply with RELA by proving its agent was licensed. *Id.* Therefore, Miller could not recover the commission. *Id.*

In the Term Sheet in this case, SJH's name appears in the paragraph entitled "Brokerage Fee," rather than Neary's name. It is undisputed that SJH did not hold a license at the time of the Comunidad transaction,[5] and could not plead and prove it was a duly licensed real estate broker in its suit to recover a commission. Without the name of a licensed broker, the Term Sheet cannot be in strict compliance with RELA. *See also Schmidt v. Matise*, 747 S.W.2d 883, 885 (Tex.App.-Dallas 1988, writ denied) ("When an entity whose name appears in a real estate sales contract as broker seeks to recover the commission in its own name, then the entity must establish that it, as opposed to its agents, officers, or employees, was a licensed broker at the time the alleged services were commenced."); *Cissne v. Robertson*, 782 S.W.2d 912, 921–23 (Tex.App.-Dallas 1989, writ denied) (even if previous drafts of agreement stated that salesman was acting on behalf of licensed broker, parties would be bound by language in the final signed agreement that did not mention name of licensed broker; neither salesman nor broker could recover commission).

As to the fourth *Lathem* requirement, identification of the property with reasonable certainty, the Term Sheet identifies the "Property" as "Those particular Apartment Communities commonly known as Harbortree, Balboa, Capital Estates, Wisteria Gardens, Oaks of Brittany, Kensington Club I & II, Stonehaven at the Galleria, and Fondren Court." No further location or address is given, and no reference is made to any other existing writing that further describes or identifies the property. While a metes and bounds description is not necessary, the writing must furnish the data to identify the property with reasonable certainty. *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex.1996). Parol evidence may be used to explain or clarify the written agreement, but not to supply the essential terms. *Id.* Appellants argue that the final purchase agreement further identifies "Harris County, Texas" as the location of the apartment complexes, and the property is "more particularly described in Exhibit A" to the agreement. Exhibit A is not attached to the copy of the agreement appellants reference in the record. We question whether the property has been described with "reasonable certainty" as required under RELA. *See Tex. Builders*, 928 S.W.2d at 481. We need not decide this issue, however, because the Term Sheet is insufficient under RELA for the reasons we have already discussed.

Appellants concede the Term Sheet by itself does not meet RELA's requirements. They contend, however, that when the Term Sheet is read together with the e-mails exchanged before and after, a memorandum satisfying RELA was made. Appellants cite numerous cases for the well-

---

**5.** RELA requires pleading and proof that the person who seeks a commission for an act as a broker was "a license holder at the time the act was commenced." TEX. OCC.CODE ANN. § 1101.806(b)(1) (West 2004).

settled propositions that a contract may consist of more than one document, and that documents pertaining to the same transaction may be read together even if they are executed at different times and do not reference each other. *See, e.g., In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010). Several of the cases on which appellants rely, however, were not decided under RELA. *See, e.g., id.* (suit to enforce contractual forum selection clause); *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (settlement agreement under Rule 11, Texas Rules of Civil Procedure); *Adams v. Abbott*, 151 Tex. 601, 604–05, 254 S.W.2d 78, 80 (1952) (contract for sale of farm); *Joiner v. Elrod*, 716 S.W.2d 606, 609 (Tex.App.-Corpus Christi 1986, no writ) (contract to convey land). The cases interpreting and applying RELA do appear to require that the writing "furnish, either within itself or by reference to some other existing document," the essential elements of the agreement. *See Tex. Builders*, 928 S.W.2d at 481; *see also Owen v. Hendricks*, 433 S.W.2d 164, 166–67 (Tex. 1968) (court refused to read two letters together to constitute signed memorandum under RELA where "there is nothing in the letter signed by respondent that even remotely suggests the existence of another writing," even though "the two letters obviously relate to the same subject matter"). *See also Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 636 (Tex.1997) ("We consistently have refused to erode [RELA] with the same exceptions as may render oral contracts within the general statute of frauds enforceable.").

Even when the Term Sheet and e-mail messages are read together, however, they indicate at most an effort by Kobernick and Neary to negotiate an agreement on the terms upon which a commission would be paid. The documents do not constitute a signed, written memorandum setting forth the essential terms of an agreement as required for strict compliance with RELA. *See Lathem*, 290 S.W.3d at 925 (strict compliance with RELA is required). As stated in *Harkinson:*

> As a licensed real estate broker, Harkinson cannot act or forbear from acting in reliance on anything less than a signed written commission agreement. When a broker does so and relies on a promise to sign a written agreement that would satisfy [RELA], the broker inevitably does so at his or her own peril. [RELA] is clear and unequivocal, and the courts have been strict in adhering to its requirements. We continue that adherence today.

*Harkinson*, 944 S.W.2d at 636–37. We conclude that summary judgment in favor of appellees was proper.

In light of our conclusion that the summary judgment was properly granted under RELA, we need not reach the questions whether the Seller entities were sued timely under the applicable statute of limitations and whether appellants provided required advice regarding title insurance. *See* Tex.R.App. P. 47.1 (written opinion must address every issue raised and necessary to final disposition of appeal).

CONCLUSION

Because there was no contract meeting the requirements of RELA, summary judgment for appellees was proper. We affirm the trial court's judgment.