

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-19-00798-CV

Stephen W. **MABERY** and Damon Thorpe,
Appellants

v.

**MORANI RIVER RANCH HOLDINGS LP**, Morani GP LLC, Morani River Ranch LLC,
Kevin L. Reid and Stewards of Wildlife Conservation Inc.,
Appellees

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CI03565
Honorable Antonia Arteaga, Judge Presiding

Opinion by: Irene Rios, Justice

Sitting: Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed: May 26, 2021

AFFIRMED

In this suit to obtain a real estate brokerage commission, the trial court granted summary judgment in favor of appellees, Morani River Ranch Holdings LP, Morani GP LLC, Morani River Ranch LLC, Kevin Reid, and Stewards of Wildlife Conservation Inc. (collectively "Morani" or the "Morani Entities") based on the statute of frauds provision of the Real Estate License Act ("RELA"). Stephen Mabery and Damon Thorpe (collectively the "Appellants") argue the trial court erred in granting Morani's motion for summary judgment because they produced a written agreement to pay the commission that satisfied RELA's statute of frauds provision. Appellants

also assert they raised a genuine issue of material fact precluding summary judgment, and the trial court's order granting summary judgment was based on a case that has been withdrawn and superseded during the pendency of this appeal. We affirm the trial court's judgment.

BACKGROUND

The Morani River Ranch (the "Ranch") is an exotic game ranch that was owned by Morani River Ranch Holdings, LP. Morani River Ranch, LLC ran a successful business breeding exotic game and selling exotic game hunts on the Ranch. Appellants were hired by Kevin Reid to provide ranch and deer management consulting services on the Ranch. Appellants are also licensed real estate brokers who jointly own Black Brush Properties, LLC ("Black Brush"), a farm and ranch commercial brokerage that specializes in hunting and recreational properties.[1] While providing consulting services, Appellants learned Reid was interested in selling the Ranch. Although Reid did not sign a listing agreement with Appellants, he orally agreed to pay Appellants a 5% commission if they were able to procure a buyer that was ready, willing, and able to purchase the Ranch on terms acceptable to Reid.

In December of 2013, Appellants introduced Wayne Bisbee to Reid because Bisbee was interested in purchasing the Ranch through his non-profit organization, Bisbee's Fish and Wildlife Conservation Fund ("BFWC"). To purchase the Ranch, BFWC first had to obtain a charitable contribution from the Mark Paul Terk Charitable Trust (the "Trust").[2] Bisbee subsequently contacted Glenn Staack, trustee of the Trust, to solicit a contribution large enough to purchase the Ranch. Staack indicated the Trust may make the contribution and began discussions with Reid on the purchase price of the Ranch. BFWC would purchase and take title to the Ranch with funds

---

[1] Black Brush was originally a party to this suit but filed a nonsuit early in the case. Mabery and Thorpe continued to litigate the case in their individual capacities only.
[2] The Trust had made several contributions to BFWC in the past.

that were contributed to BFWC from the Trust. BFWC planned to take full control of the Ranch and use it to further its charitable purpose of wildlife conservation.

On April 17, 2014, Thorpe sent Reid a draft contract to review for BFWC to purchase the Ranch for $15 million.[3] In a reply email to Thorpe, Reid inquired whether the Appellants would accept a $500,000 flat brokerage fee rather than a brokerage commission based on 5% of the sale price. Thorpe rejected this offer and insisted that the brokerage fee remain at 5% of the sale price. After a few email exchanges, Reid agreed to "stick with the 5%[.]" These emails were exchanged prior to, and in contemplation of, the execution of the contract to sell the Ranch to BFWC.

On June 27, 2014, BFWC and Reid, on behalf of Morani River Ranch Holdings, LP, executed a contract for BFWC to purchase the Ranch for $11 million (the "2014 Contract"). The 2014 Contract states: "All obligations of the parties for payment of broker's fees are contained in a separate written agreement." A brokerage fee agreement was attached to the contract. The 2014 Contract required BFWC to deposit earnest money in escrow upon execution of the contract and set a closing date thirty days from the date of the contract's execution.

Contemporaneously with the 2014 Contract, BFWC and Reid, on behalf of Morani River Ranch, LLC, executed an asset purchase agreement for BFWC to purchase the hunting and breeding business operated on the Ranch for $5 million (the "2014 APA"). The 2014 APA also required an earnest money deposit in escrow within two business days and set a closing date for thirty days from the 2014 APA's execution. In addition, satisfaction of the closing conditions of the real property sale under the 2014 Contract was a condition precedent to the closing of the 2014 APA.

---

[3] This purchase price included the purchase of the real estate and the hunting and breeding business.

The Trust never made the contributions to BFWC, and the parties failed to close on the 2014 Contract and 2014 APA. When it became apparent that BFWC would not be able to purchase the Ranch, Reid sent Bisbee and Staack an assignment purporting to assign BFWC's rights, as buyer, to the Trust. Although Reid signed the assignment—seemingly as a seller's consent to the buyer's rights being assigned to a different buyer—it was never signed by BFWC or the Trust. After the 2014 Contract and APA failed to close, Appellants had no further involvement in selling the Ranch.

In May of 2017, Morani River Ranch Holdings, LP sold an undivided 84.08% interest of the Ranch to Stewards Real Estate Holdings, Inc ("Stewards"), an entity controlled by Staack, for $8 million. Morani River Ranch Holdings, LP donated the other undivided 15.92% of the Ranch to Stewards of Wildlife Conservation, Inc., a non-profit corporation founded by Reid.

When Appellants learned the Ranch had been sold to an entity controlled by Staack, they sued Morani seeking a 5% brokerage commission on the sale. Morani filed a motion for summary judgment asserting it was entitled to judgment as a matter of law because the agreement to pay the 5% commission under the 2014 Contract was limited only to a sale to BFWC, and there is no written agreement—that satisfies the statute of frauds provision of RELA—to pay a 5% commission on any other sale. The trial court granted Morani's motion for summary judgment and rendered a take-nothing judgment in favor of Morani. Appellants appeal the trial court's judgment.

## STANDARD OF REVIEW

We review a trial court's ruling on a summary judgment motion de novo. *Tarr v. Timberwood Park Owners Ass'n., Inc.*, 556 S.W.3d 274, 278 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident*

*Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). In reviewing a trial court's summary judgment ruling, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Knott*, 128 S.W.3d at 215.

## DISCUSSION

Appellants argue the trial court erred in granting summary judgment in favor of Morani because they produced several written agreements that satisfy the requirements under RELA's statute of frauds provision and entitle them to a commission on the 2017 sale to Stewards. Appellants also argue material issues of fact precluded summary judgment, and the trial court erroneously based its decision on a case that has since been withdrawn and superseded.

### STATUTE OF FRAUDS UNDER THE REAL ESTATE LICENSE ACT

The RELA statute of frauds provision in section 1101.806(c) of the Texas Occupations Code states:

> A person may not maintain an action in this state to recover a commission for the sale or purchase of real estate unless the promise or agreement on which the action is based, or a memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign the document.

TEX. OCC. CODE ANN. § 1101.806(c); *see also Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996) ("A real estate broker may not sue for a commission unless the agreement is evidenced by a writing complying with the Real Estate License Act."). "The [l]egislature was quite explicit: a broker may not recover a commission unless the commission agreement is in writing and signed by the party to be charged." *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 635 (Tex. 1997). Therefore, we have required strict compliance with RELA and held an "agreement to pay a real estate commission must be in writing or it is not enforceable." *Brice v. Eastin*,

691 S.W.2d 54, 57 (Tex. App.—San Antonio 1985, no writ); *see also Harkinson*, 944 S.W.2d at 637 (holding Texas courts strictly adhere to RELA's statute of fraud requirements).

"To comply with this section, an agreement or memorandum must: (1) be in writing and must be signed by the person to be charged with the commission; (2) promise that a definite commission will be paid, or must refer to a written commission schedule; (3) state the name of the broker to whom the commission is to be paid; and (4) either itself or by reference to some other existing writing, identify with reasonable certainty the land to be conveyed." *Lathem v. Kruse*, 290 S.W.3d 922, 925 (Tex. App.—Dallas 2009, no pet.); *see also Levenson v. Alpert*, 399 S.W.2d 955, 956 (Tex. App.—San Antonio 1966, no writ) (holding same requirements to comply with section 1101.806(c)'s predecessor statute). "The essential elements of a commission agreement cannot be supplied by parol evidence." *Boyert v. Tauber*, 834 S.W.2d 60, 62 (Tex. 1992).

A defendant moving for summary judgment based on section 1101.806(c) must prove: (1) the plaintiff's suit is for the recovery of a commission for the sale or purchase of real estate, and (2) the defendant signed no written promise, agreement, or memorandum to pay a commission. *See* TEX. OCC. CODE ANN. § 1101.806(c); *Neary v. Mikob Props., Inc.*, 340 S.W.3d 578, 584 (Tex. App.—Dallas 2011, no pet.); *McKellar v. Marsac*, 778 S.W.2d 573, 576 (Tex. App.—Houston [1st Dist.] 1989, no writ). Thus, "[a] seller may defeat a claim seeking payment of a real estate commission by establishing that the seller did not sign an agreement to pay the commission." *NLD, Inc. v. Huang*, 615 S.W.3d 444, 450 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). "When RELA applies and its requirements are not met, courts have denied recovery when fraud, conspiracy, deceit, quantum meruit[, promissory estoppel,] and breach of contract have been pleaded." *Lathem*, 290 S.W.3d at 925; *Harkinson*, 944 S.W.2d at 636–37 (holding failure to satisfy requirements of RELA's statute of frauds provision bars recovery under a claim for promissory estoppel); *see also Frady v. May*, 23 S.W.3d 558, 562 (Tex. App.—Fort Worth 2000, pet. denied)

("RELA bars actions in both contract and tort for recovery of a real estate commission that does not comply with its requirements that the agreement or promise to pay a commission be in writing." (citing *Harkinson*, 944 S.W.2d at 636–37)).

Here, Appellants concede their suit is for the recovery of a commission for the sale of real estate. Therefore, this case turns on whether Morani signed a written promise, agreement, or memorandum to pay Appellants a commission on the 2017 sale to Stewards. On summary judgment, Morani argued the only written agreement signed by Reid to pay a commission relating to the sale of the Ranch was the 2014 Contract between Morani River Ranch Holdings, LP and BFWC. Morani further argued that sale never closed and there is not a written agreement entitling Appellants to a commission for the 2017 sale to Stewards. Morani supported its arguments with Reid's affidavit that stated: "[Other than the 2014 Contract], I never signed or intended to sign any other document agreeing to pay a commission to Stephen Mabery, Damon Thorpe, or Black Brush Properties, LLC with respect to any other transaction for the sale of the Morani River Ranch."

Appellants contend the following documents, produced in its response to summary judgment, are written agreements to pay a commission that satisfy section 1101.806(c): (1) the April 2014 emails; (2) the contract attached to the April 2014 emails; (3) the 2014 Contract; (4) the brokerage fee addendum attached to the 2014 Contract; (5) the 2014 APA; and (6) the unexecuted assignments purporting to transfer the buyer's rights from BFWC to the Trust. We must first determine whether any of these documents satisfy the statute of frauds requirement under section 1101.806(c).

### 1. The April 2014 Emails

Appellants urge us to read the April 2014 emails together as though they are one written agreement. Morani argues each of the April 2014 emails are separate writings and should be read

separately. These arguments are immaterial because the April 2014 emails relied upon by Appellants, even when considered together, do not satisfy RELA's statute of frauds provision.

First, the April 2014 emails do not promise that a definite commission will be paid. "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Initially, Thorpe sent Reid an email purportedly containing a draft of the 2014 Contract and asking Reid to review the terms of the draft contract. Reid replied asking if Appellants were "OK with a flat brokerage fee of $500k." Thorpe responded, "we are not OK with just a flat $500k brokerage fee. Our agreement was 5% unless we had to negotiate down" on the price of the Ranch. Reid replied again urging a flat brokerage fee of $500,000 and asserting that the commission would only pertain to the sale of the real estate, and not to the sale of the breeding and hunting business. Thorpe again rejected this flat brokerage fee. Reid replied he didn't "want this to turn into a battle. We will stick with the 5%, but I am disappointed." Thorpe responded: "We don't either and don't want you to be disappointed. Let's meet next week . . . ." The last email was from Reid and stated, "I am going to stay focused on the deal and then we can worry about how to cut up the pig once we get it killed."

The April 2014 emails are no more than ongoing negotiations between Appellants and Reid on the amount of the brokerage commission that would eventually be integrated into the 2014 Contract.[4] "When it is alleged that an email amounts to a contract binding on the sender, the email's context must be carefully examined to determine whether it truly evidences the grave intent

---

[4] The notion that the April 2014 emails are merely negotiations is supported by the merger clause in the 2014 Contract that states: "This contract contains the entire agreement of the parties and cannot be changed except by their written agreement."

to be legally bound." *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 728 (Tex. 2020). "Courts applying Texas law have confirmed that such writings couched in futuristic language contemplating later negotiations do not satisfy the statute of frauds." *Id.* at 729. As such, the April 2014 emails do not satisfy RELA's statute of frauds provision because they do not contain a promise that a definite commission will be paid and are merely communications contemplating a contract or promise to be made in the future. *See id.* (analyzing emails leading up to a contract and holding "[t]o satisfy the statute of frauds, it is not enough that the writings state potential contract terms"); *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 778–79 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding a writing containing "futuristic" language only contemplating "a contract or promise to be made in the future does not satisfy the requirements of the statute of frauds").

Next, "[t]he cases interpreting and applying RELA do appear to require that the writing 'furnish, either within itself or by reference to some other existing document,' the essential elements of the agreement." *Neary*, 340 S.W.3d at 587 (quoting *Keller*, 928 S.W.2d at 481). Here, the April 2014 emails do not describe the real estate at issue. Appellants attempt to satisfy this element by stating there is a sufficient description of the real estate in the initial draft of the 2014 Contract that is allegedly attached to Thorpe's April 17 email to Reid. Thorpe stated in his April 17 email:

> I made some time to get this to you for you to start looking over. Obviously[,] there are plenty of things that I don't have correct but you can tell me all that. Anyway, look it over and we can go from there.

Nothing in this email references the draft 2014 Contract as the means or data by which the real estate at issue may be identified. *Keller*, 928 S.W.2d at 481 ("To comply with the Act, the writing must furnish, either within itself or by reference to some other existing document, the means or data by which the real estate at issue may be identified.").

It is true that Thorpe's April 17 email does appear to have had a document labelled "Morani-Bisbee Contract.041714" attached to it. But Appellants make the bare assertion that a draft of the 2014 Contract attached to this email contains a sufficient description of the real estate. Appellants have not pointed us to any evidence supporting this contention. While Appellants did produce the draft 2014 Contract purportedly attached to Thorpe's April 17 email as summary judgment evidence, Appellants have not directed us to evidence showing the draft 2014 Contract is the same document that was attached to the email. Moreover, Thorpe admits in his email there are terms that are not correct within the attached draft contract and concedes it is only a draft that will be integrated into some future agreement. *See Bujnoch*, 593 S.W.3d at 730 (holding emails containing terms proposed to be incorporated into a later contract fails to satisfy the statute of frauds "because they reflect one party's description of terms to be discussed at a future meeting, rather than any party's 'agreement' to be bound by a 'contract.'"). Accordingly, the April 2014 emails do not satisfy RELA's statute of frauds provision.

*2. The 2014 Contract and Broker Fee Addendum*

Section 22 of the 2014 Contract confirms that the Broker Fee Addendum is attached and part of the 2014 Contract. Therefore, we read these two documents together as though they are one contract. *See Bujnoch*, 593 S.W.3d at 727 ("[A] court may determine as a matter of law, that multiple documents comprise a written contract.").

The 2014 Contract is in writing and is signed by Kevin Reid on behalf of Morani River Ranch Holdings, LP. The addendum attached to the 2014 Contract promises a commission to be paid to the "Listing/Principal Broker" in the amount of $670,000. The Addendum names Stephen W. Mabery as the "Listing or Principal Broker" and names Damon Thorpe as the listing broker's

"Licensed Supervisor." Finally, the 2014 Contract identifies the real estate at issue.[5] Accordingly, the 2014 Contract satisfies RELA's statute of fraud requirements.

Having determined the 2014 Contract satisfies RELA's statute of frauds requirements, we must next determine whether the 2014 Contract entitles Appellants to recover a commission for the 2017 sale of the Ranch to Stewards. Morani does not contest Appellants' assertion that the 2014 Contract is a written agreement that satisfies RELA's statute of frauds provision. Rather, Morani argues the 2014 Contract only entitles Appellants to recover a commission upon a closing between Morani River Ranch Holdings, LP and BFWC.

The broker's fee addendum states:

> Upon closing of the sale by Seller to Buyer of the Property described in the contract to which this fee agreement is attached . . . [,] Seller [] will pay Listing/Principal Broker a cash fee of $670,000 . . . .

The 2014 Contract, relied on by Appellants, defines "Seller" as Morani River Ranch Holdings, Limited Partnership, and defines "Buyer" as Bisbee's Fish & Wildlife Conservation Fund, Inc. No other Buyer is defined in the 2014 Contract, and the contract contained a merger clause stating the "contract contains the entire agreement of the parties and cannot be changed except by their written agreement."

"Where the contract is subject to a condition, the broker who negotiated the contract is not entitled to a commission unless the condition is met because he has not performed his agreement to produce a purchaser willing and able to buy on the owner's terms." *Frady*, 23 S.W.3d at 563; *see also Snoddy v. Wallace*, 625 S.W.2d 81, 83–84 (Tex. App.—Tyler 1981, writ ref'd n.r.e.) (holding broker was not entitled to commission when agreement required acceptance within a specified time, even when seller accepted buyer's offer after the time specified had expired);

---

[5] Morani does not contest the sufficiency of the real estate description.

*McCarty v. Brown*, 460 S.W.2d 450, 452–53 (Tex. App.—Tyler 1970, writ ref'd n.r.e.) (holding broker was not entitled to a commission when her commission was tied to a contingency that never occurred).

The writing relied upon by Appellants specified that the brokerage commission was conditioned upon the closing between BFWC and Morani River Ranch Holdings, LP. This condition must be met before Appellants are entitled to recover a commission. Here, the contract between Morani River Ranch Holdings, LP and BFWC never closed, and BFWC never bought the Ranch.

Appellants argue the 2014 Contract was never terminated and their commission agreement survived and can be applied to the 2017 sale of the Ranch to Stewards. However, the cases cited by Appellants are distinguishable.

In *Frady v. May*, the buyer and seller entered into a contract with a broker's commission agreement. *Frady*, 23 S.W.3d at 561. Like the case at bar, the broker's commission in *Frady* was contingent "on closing of this sale." *Id.* The first contract did not close, and the buyer and seller executed a second contract that did not contain the broker's commission in it. *Id.* The second contract closed. *Id.* The *Frady* court held that "on closing of this sale" meant a closing between that particular seller and that particular buyer. *Id.* at 565. Because "closing of this sale" was interpreted as a closing between that particular seller and that particular buyer, the court held that the brokerage commission agreement did not expire with the first contract and could be fully enforced when the ultimate sale between the *same* buyer and the *same* seller closed. *Id.*

Here, the 2017 Contract defined Stewards Real Estate Holdings, Inc. as the buyer. Because the sale that actually closed on the Ranch was between Morani River Ranch Holdings, LP and Stewards, Appellants are not entitled to recover a commission under the 2014 Contract. This

distinguishing fact—that Stewards, rather than BFWC, closed on the ranch—is fatal to the Appellants reliance on *Frady*.

Appellants also rely on *NLD, Inc. v. Huang*, a recent opinion from our sister court in Houston, to support their argument. *NLD*, 615 S.W.3d at 453.

In *NLD*, the buyer entered into a contract to buy a motel from the seller. *Id.* at 446. The contract included a brokerage commission that was conditioned upon "the closing of this sale." *Id.* The buyer in the first *NLD* contract was an individual named Bahkta. *Id.* Although the first contract did not close, because there was a potential cloud on the title, the parties never formally terminated the first contract. *Id.* at 447. The parties entered into a second contract after the title issue was resolved, but the buyer in the second *NLD* contract was an entity in which Bahkta owned 40%. *Id.* at 448. Notwithstanding the substitution of Bahkta's entity as the buyer, the *NLD* court held the buying and selling parties were the same in the original and completed transaction. *Id.* at 453. The *NLD* court further held that the commission agreement in the first contract had not been terminated and, when the buyer and seller in the first contract ultimately consummated the transaction in the second contract, the broker was entitled to recover his commission under the first contract. *Id.* The court does not explain why it treated Bahkta and his entity as the same buyer.

The case at bar is distinguishable because the buyers are not the same in the 2014 Contract and the 2017 Contract. In this case, the buyer in the 2014 Contract is BFWC. The buyer in the 2017 Contract is Stewards. Ultimately, it was Stewards and Morani River Ranch Holdings, LP that closed on the 2017 Contract. Because the commission agreement in the 2014 Contract was contingent upon a closing between Morani River Ranch Holdings, LP and BFWC, the 2014 Contract does not entitle Appellants to a commission on the 2017 sale to Stewards. Therefore, Appellants cannot rely on the 2014 Contract to recover a commission on the 2017 sale to Stewards.

*3. The 2014 APA*

In relation to the brokerage commission, the 2014 APA states in the Seller's Representations section:

> Except for the commission due Black Brush Properties, LLC, no broker or finder is entitled to any brokerage, finder's fee or other commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

Under the Covenants and Agreements section, the 2014 APA states:

> Upon closing of the sale by *Seller to Purchaser* of the real property and improvements on the Ranch as contemplated in the Real Property PA, Seller will pay Black Brush Properties, LLC a commission equal to 5% of the purchase price paid under Real Property PA. No additional commissions are due related to the purchase of the Assets under this Agreement.[6]

The 2014 APA simply refers to the sale that is contemplated in the 2014 Contract and is not an independent agreement to pay a commission. We have already determined Appellants are not entitled to a commission under the 2014 Contract. Therefore, Appellants' reliance on the 2014 APA's reference to the 2014 Contract is inapposite. Moreover, the 2014 APA defines "Purchaser" as BFWC and conditions the commission agreement upon closing of the sale to BFWC. Accordingly, the 2014 APA does not satisfy RELA's statute of frauds requirements and cannot be relied on by Appellants to recover a commission on the 2017 sale to Stewards.

*4. The Unexecuted Assignments*

After it became apparent that the Trust was not going to contribute the necessary funds to BFWC to close the 2014 Contract, Reid sent assignments to BFWC and the Trust so the Trust would stand in the place of BFWC under both the 2014 Contract and 2014 APA and purchase the Ranch directly. The assignments were never executed and BFWC never assigned its rights to the Trust. Appellants briefly argue the unexecuted assignments show Reid's acquiescence to a

---

[6] The 2014 APA refers to the 2014 Contract as the Real Property PA, and BFWC as "Purchaser" rather than "Buyer."

commission agreement on a sale to the Trust. Appellants fail to cite any authority supporting their argument. Here, the only written agreement memorializing a commitment to pay Appellants a commission on the sale of the Ranch was the 2014 Contract. The payment of the commission in the 2014 Contract was contingent upon a closing between the "Buyer," BFWC, and "Seller," Morani River Ranch Holdings, LP. Neither BFWC nor the Trust executed the assignments and the "Buyer" of the 2014 Contract remained BFWC. As explained above, the closing of a sale of the Ranch to BFWC was a condition to the Appellants' entitlement to a commission. The unexecuted assignments did not change the "Buyer" of the 2014 Contract and the condition remained unchanged. Accordingly, the unexecuted assignments do not entitle Appellants to a commission for the 2017 Ranch sale to Stewards.

In sum, the only written agreement to pay Appellants a commission on the sale of the Ranch is the 2014 Contract. The 2014 Contract conditioned the commission upon closing of the sale between Morani River Ranch Holdings, LP and BFWC. A closing between those two parties never occurred and, therefore, Appellants were not entitled to a commission under the 2014 Contract. Accordingly, Appellants' first issue is overruled.

GENUINE ISSUES OF MATERIAL FACT

Appellants argue they raised three genuine issues of material fact in their response to Morani's motion for summary judgment: (1) whether Appellants procured Staack as a buyer; (2) whether the partial performance exception to the statute of frauds applies; and (3) whether the April 2014 emails constitute a written agreement.

*1. Actual Buyer*

"[W]hen [a] movant's motion for summary judgment is granted, the complaining party who seeks relief in [a reviewing] court has the burden of showing . . . the trial court erred in granting the motion for summary judgment." *Anderson v. Bormann*, 489 S.W.2d 945, 948 (Tex.

App.—San Antonio 1973, writ ref'd n.r.e.). "[I]n most summary judgment cases, the appellant against whom such a judgment has been rendered must show that, considering the pleadings and the summary judgment proof, the trial court erred in concluding that there was no material issue of fact." *Id.* "[The appellant] need not show that the summary judgment record discloses the existence of a material issue of fact." *Id.* "But [the appellant] must show that the proof is insufficient to establish, as a matter of law, the absence of such an issue." *Id.* "Materiality is a criterion for categorizing factual disputes in relation to the legal elements of the claim." *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). "The materiality determination rests on the substantive law, and only those facts identified by the substantive law to be critical are considered material." *Id.* "Stated differently, '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

As a matter of law, Appellants cannot maintain an action to recover a commission on the 2017 sale of the Ranch unless they can produce a promise or agreement signed by Morani memorializing their right to a commission on that sale. TEX. OCC. CODE ANN. § 1101.806(c). The only written commission agreement produced by Appellants is the 2014 Contract. That contract specifically required a sale between Morani River Ranch Holdings, LP and BFWC before Appellants could recover a commission. As such, the issue of whether Appellants procured Staack as a buyer is immaterial because Appellants are not able to produce a written agreement showing they are entitled to a commission for the 2017 sale. *See Brice*, 691 S.W.2d at 57 ("The mere fact that Brice procured the buyer is not sufficient to enable him to recover a commission in absence of a contract in writing signed by Eastin.").

*2. Partial Performance Exception*

Appellants argue they are still entitled to recover a commission on the 2017 sale of the Ranch—even though there is no written agreement that satisfies RELA's statute of frauds provision—because their claim falls within the partial performance exception.

"The doctrine of part[ial] performance, under the general statute [of frauds], developed as a protection to a purchaser of land who, in reliance upon an oral contract, paid consideration, took possession of the realty and/or made valuable improvements upon the land." *Id.*; *see also Myer v. Kitano*, No. 93-1787, 1994 WL 83429, at *3 (5th Cir. 1994) (not for publication) ("In general, the doctrine of part[ial] performance shields contracts for the sale of real estate from invalidation under the [s]tatute of [f]rauds, if certain requirements are satisfied."). However, we have held that the doctrine of partial performance does not apply to RELA brokerage commission contracts because the equitable justifications for the exception to the general statute of frauds "are not present in the context of brokers . . . licensed to practice real estate." *Brice*, 691 S.W.2d at 57; *see also Harkinson*, 944 S.W.2d at 636 (reaffirming "the doctrine of partial performance would not render [a brokerage commission] agreement enforceable" when it failed to comply with RELA's statute of frauds provision); *see also Myer*, 1994 WL 83429, at *3 ("The applicability of the part[ial] performance doctrine to TRELA brokerage commission contracts is doubtful . . . .").

Since our holding in *Brice*, other jurisdictions have applied the partial performance exception to enforce a brokerage commission agreement, but only when an otherwise valid agreement lacked a precise identification of the property. *See Burton Creek Dev., Ltd. v. Cottrell*, No. 07-15-00014-CV, 2016 WL 7321793, at *7 (Tex. App.—Amarillo Dec. 14, 2016, no pet.) (applying the doctrine of partial performance to enforce a commission agreement "[w]hen a real estate broker's commission agreement fails to adequately describe the property . . . ."); *Collins v. Beste*, 840 S.W.2d 788, 792 (Tex. App.—Fort Worth 1992, writ denied) ("[a] written real estate

commission agreement that fails to describe the property precisely may be enforceable" under the partial performance exception); *Carmack v. Beltway Dev. Co.*, 701 S.W.2d 37, 41 (Tex. App.—Dallas 1985, no writ) ("We limit our decision to the holding that under [the doctrine of partial performance] a written real-estate-commission agreement that fails to describe the property with precision may be enforced by the broker notwithstanding [RELA's statute of frauds provision]."); *Myer*, 1994 WL 83429, at *3 ("When it has been held to apply to brokerage commission cases . . . , the doctrine [of partial performance] has been used to enforce commission agreements that lacked only a precise identification of the property."). *But see Boyert*, 834 S.W.2d at 63–64 (assuming, for purposes of argument, that partial performance would apply when commission agreement did not specify the broker to whom the commission was to be paid, but holding the doctrine was inapplicable to the facts of the case).

However, we are unable to locate—and Appellants have not directed us to—any authority that would allow a broker to recover a commission in the complete absence of any agreement entitling the broker to the commission. Here, the only agreement entitling Appellants to a commission is the 2014 Contract and that contract conditioned the commission on a closing with BFWC. Appellants have not presented any agreement that would entitle them to a commission for the 2017 sale of the Ranch to Stewards. Instead, Appellants argue they are entitled to a commission from the 2017 sale based on their performance alone. "Allowing a broker to recover on the ground of his performance alone would permit enforcement of any commission agreement fully performed by the broker whether or not it complies with [RELA's statute of frauds provision]." *Boyert*, 834 S.W.2d at 64; *see also Carmack*, 701 S.W.2d at 41 ("We do not hold that a broker's full performance alone is sufficient to take a commission agreement out of [RELA's statute of frauds provision] because such a construction would nullify the statute."). "This would be in direct opposition to the expressed will of the legislature and would unduly expose the public to fraudulent

claims for commissions." *Boyert*, 834 S.W.2d at 64; *see also Harkinson*, 944 S.W.2d at 635 ("The [l]egislature was quite explicit: a broker may not recover a commission unless the commission agreement is in writing and signed by the party to be charged."). Further, the Texas Supreme Court disfavors exceptions to RELA's statute of frauds provision and has "consistently . . . refused to erode [RELA's statute of frauds provision] with the same exceptions as may render oral contracts within the general statute of frauds enforceable." *Harkinson*, 944 S.W.2d at 636.

Moreover, cases applying the partial performance exception to commission agreements have only done so to prevent the seller from perpetrating a virtual fraud on the broker because there was "strong" evidence—that was corroborated by both parties—showing the commission was due. *See Cottrell*, 2016 WL 7321793, at \*8 ("Under these limited circumstances, we hold that the application of the statute of frauds would work an injustice rather than prevent it . . . ."); *Carmack*, 701 S.W.2d at 41 ("Under these circumstances we hold that the use of [RELA's statute of frauds provision] to deny liability for the commission would perpetuate fraud rather than prevent it."); *see also Boyert*, 834 S.W.2d at 63 ("Absent corroboration, partial performance of a brokerage agreement does not excuse compliance with the requirement that there be a written brokerage agreement . . . ."). While there may be some corroborating evidence that shows a commission would have been due under the 2014 Contract had that sale closed, there is no corroborating evidence showing a commission was due to Appellants from the 2017 sale that did close. *See Lathem*, 290 S.W.3d at 929 (affirming summary judgment when broker did not raise a fact issue because he failed to bring forth evidence of a commission agreement that was corroborated by seller). Accordingly, we hold the partial performance exception does not apply in this case.

3. *April 2014 Emails as Written Agreement*

As explained above, the April 2014 emails do not satisfy RELA's statute of frauds provision even when we construe the email chain as a single written agreement. Appellants

contend it is a question of fact to determine whether the "emails read together contain the essential terms of an agreement." However, the only case cited by Appellants was reversed by the Texas Supreme Court on this very issue. The supreme court held "[a] court may determine, as a matter of law, that multiple documents comprise a written contract" and "[w]hen considering multiple writings proffered as a single contract, it remains the rule that the essential elements of the agreement must be evident from the writings themselves, without resorting to oral testimony." *Bujnoch*, 593 S.W.3d at 727 (internal quotations omitted). Accordingly, we overrule Appellants' second issue.

### DECISION BASED ON WITHDRAWN AND SUPERSEDED OPINION

In their third issue, Appellants argue the trial court erroneously based its order granting summary judgment on an opinion preceding *NLD, Inc. v. Huang*, 615 S.W.3d 444 (Tex. App.—Houston 2019, pet. denied). We have distinguished the facts of the case at bar from the facts in the current *NLD* opinion and have determined that *NLD* is not dispositive of this appeal. Accordingly, we overrule Appellants' third issue.

### CONCLUSION

The judgment of the trial court is affirmed.

Irene Rios, Justice